THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* OTTO SCHULTZ, Plaintiff in Error.

*Opinion filed February 17, 1915.*

1. CRIMINAL LAW—*instructions not based upon evidence should not be given.* On the trial of an issue of fact, only such instructions should be given as are based upon legitimate evidence, and if irrelevant instructions stating correct abstract rules of law calculated to mislead the jury are given, it will be reversible error.

2. SAME—*when giving instructions defining manslaughter in a murder trial is reversible error.* Where there is no evidence whatever which would reduce the crime of murder to manslaughter but the testimony is such that the defendant must be either innocent or guilty of murder, it is reversible error to give instructions defining the crime of manslaughter, which the jury followed in finding the defendant guilty of such crime, even though the judgment would not have been reversed had no such instruction been given.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. CHARLES A. McDONALD, Judge, presiding.

BRUNDAGE, LANDON & HOLT, for plaintiff in error.

P. J. LUCEY, Attorney General, MACLAY HOYNE, State's Attorney, and GEORGE P. RAMSEY, for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Plaintiff in error was indicted for the murder of Otto Schaffner in Cook county December 30, 1913. In May, 1914, he was tried, found guilty of manslaughter and sentenced to an indeterminate term in the penitentiary. This writ of error is sued out to review the judgment of the criminal court.

Plaintiff in error is a cabinet-maker and at the time of the homicide had a shop in which he had carried on his business at 4300 Crawford avenue, Chicago, since some time in November, 1913. Before that he had a shop on Elston avenue near Crawford avenue. That place was burned some time in the late summer of 1913. The deceased was employed by plaintiff in error and worked in the shop on Crawford avenue from about December 1 until his death. He had previously worked for plaintiff in error in his shop on Elston avenue. During the month of December two fires started in the building occupied by plaintiff in error, but they were extinguished before any serious damage was done. Plaintiff in error, apparently acting on the suspicion that the fires in his premises were the work of incendiaries, was in his shop the evening of December 30, for the purpose, as he stated, of watching for the supposed incendiaries. Deceased was with him, apparently by his request. There were no lights in the building, and at about seven o'clock Schaffner was killed by a bullet from a revolver of thirty-two calibre, which entered his left temple one inch in front of and one inch above the canal of the ear, passed

through the head and came out of the right side of the head about an inch higher and a half-inch further back than the place on the left side where it entered. No one was in the building with deceased but plaintiff in error and no one else heard the shot fired.

Jacob Pies operated a sash and door factory near the shop of plaintiff in error and had been acquainted with him for five years. Pies testified that about a quarter past seven o'clock in the evening of December 30 he was in a saloon across the street from the shop of plaintiff in error and plaintiff in error came to him and asked him to go across the street, and said, "The other fellow shot himself." Pies asked plaintiff in error to tell about it there at the saloon, and suggested that they go back in the ladies' room, which they did. Plaintiff in error then said, "Now we know where all the fires came from. This man told me that he lit my place that burned down on the 9th of November, and he did that because he was sore because I would not leave him divide out with me." He asked the witness if his daughter had received a letter from deceased. He said deceased had given Rausch (who also worked for plaintiff in error) $10 to start the fire, and that deceased said he had told plaintiff in error everything in order to get rid of the trouble and was going to kill himself, and then fired the shot, and that it was done with plaintiff in error's revolver. Witness asked plaintiff in error if he believed what the deceased said about Rausch, and he replied, "That is what he told me." He asked the witness what he should do, and witness suggested that he notify the police, and this was done from the saloon, where the witness and plaintiff in error remained until the police came.

Frank E. Johnson, a police officer, testified that he was called to the place of business of plaintiff in error on the evening of December 30, and other policemen arrived there about seven-forty o'clock. Plaintiff in error went with him to the shop and to a side door that opened into the build-

ing on the south side. Witness opened the door and found the body of Schaffner lying on the floor, with the legs or feet against the door and the head to the north-west. There was no light in the building and witness lighted a match. On the right side of the body, and about three or four feet from it, was a revolver, which witness picked up and recognized as one he had seen in the possession of plaintiff in error the previous evening when witness was at his place of business, at which time Pies was present, and witness, Pies and plaintiff in error had a talk about the trouble they had had about fires and keeping watch for anyone who might try to burn their factories. At that time the witness asked plaintiff in error if he knew of any motive anyone had for wanting to destroy his property and he said he did not. Witness asked him if he was insured, and he said no; that he saw a man on Elston avenue who told him he could have insurance; that he was insured but did not have the policy. The witness further testified that when he picked up the revolver from the side of deceased he asked plaintiff in error whose it was and he said he did not know. Witness then asked him if it was not his, and he said it was. Witness inquired how deceased came to have it, and plaintiff in error said he asked for it, as he wanted to watch the building, and plaintiff in error let him have it, but later said he did not give it to deceased but laid it on a table. Witness testified plaintiff in error said he was walking up and down the street when Schaffner shot himself. He also told witness that Schaffner had said something to the effect that he had burned the place across the street, (apparently referring to the plaintiff in error's shop which was burned down;) that he was attempting to burn the present place of business, and that was the reason why he was going to shoot himself. Schaffner was still alive when found, but died about ten o'clock without having recovered consciousness. There were five loaded cartridges in the revolver and one exploded cartridge under the hammer.

Felix Rausch, at whose house Schaffner boarded, testified he and Schaffner were working for Pies when his shop burned down. Afterward they worked for plaintiff in error. The witness worked for him seven days, and said there were small fires there every day and big fires the 29th and 30th of December. When the fire occurred the 30th witness and Schaffner were notified of it by plaintiff in error and helped put it out. That fire was in the dining room of the residence of plaintiff in error, his residence being in rooms over the shop. The fire on the 29th occurred about half-past one in the afternoon. Witness was not in the shop but was in a bakery in the near vicinity when notified of it. He went to the shop, and testified he saw and smelled kerosene on a window sash, and when the fire was extinguished plaintiff in error told him to break up the frame and burn it in the stove. About a half hour afterwards an inspector came and made an examination. He asked plaintiff in error how an outsider could come in the shop in the daytime and pour kerosene on things. Plaintiff in error replied the vagabonds were up to anything. The witness further testified that on the morning of the 30th, at about eight o'clock, plaintiff in error had a revolver and was showing Schaffner· how to use it; that he pointed it at the intestines of Schaffner, and witness told him if he did not know how to handle a revolver to let it alone; that if it was fired Schaffner would be dead. Schaffner then took the revolver and put it in a box up near the window. This was the revolver offered in evidence. The box it was put in was a white paper box, having a cover which could be raised. Schaffner had a little revolver there, but there were no cartridges in it.

Dr. Reinhardt, coroner's physician, testified that he performed a post-mortem examination on the body of Schaffner on December 31, 1913. He described the wound and said it was caused by a thirty-two calibre bullet. He did not discover any powder marks, but did not say he made

any examination for them. He testified death was caused by the bullet wound, but that he had no opinion, from the examination he made, whether the wound could have been self-inflicted.

Joseph Groser testified he was in the real estate and fire insurance business and solicited plaintiff in error to take insurance on his shop. He at first said he was not prepared for it, but in December witness received his order for insurance to the amount of $1400. The witness testified the policy was never written up but that the plaintiff in error was protected.

The plaintiff in error's former place of business which burned down was insured, as we understand, for $1200, but he was paid only $840 for the loss. On the 28th of November, 1913, he borrowed from Schaffner $200, for which he gave a note, due in six months, for $210, bearing interest at seven per cent from date. This note was found in Schaffner's possession after his death. Schaffner also at a later date loaned plaintiff in error $140, which was acknowledged by receipt but no note given. The uncontradicted proof was that plaintiff in error and Schaffner were on friendly terms and had never had any controversy or falling out with each other.

The prosecution was permitted to prove, over the objection of plaintiff in error, by the daughter of Pies, that she never received any letter from deceased, that he had never made love to her or courted her, and that her acquaintance with him was slight; also by Rausch, over objection, that deceased did not offer to pay him $10 to set fire to plaintiff in error's premises. The prosecution further proved, over objections of plaintiff in error, experiments made with a thirty-two calibre revolver and bullets similar to those in the revolver of plaintiff in error, fired at a piece of white paper to determine the distance at which the paper would be powder-marked. The sheets of paper used in the experiments were introduced in evidence. The

·sheets the witness testified were six, twelve and eighteen inches from the revolver when fired had powder marks on them, but the one twenty-four inches distant had none. Felix Rausch and Mary Rausch, his wife, at whose house Schaffner boarded, testified he was right-handed.

Plaintiff in error testified in his own behalf that he was thirty years old, married, had one child, and that he had worked at the cabinet-maker's trade since he was fourteen years old. He had known Schaffner since July, 1913. At that time plaintiff in error had a shop on Elston avenue. Schaffner, Rausch and eight other men were employed by him there. That shop burned in August or September, 1913, and plaintiff in error established another place of business at 4300 Crawford avenue. He testified about the fires at his place on the 29th and 30th of December; that the fire marshal called in the afternoon of the 30th, examined the premises, and plaintiff in error told him all he knew about the fires. The fire marshal notified plaintiff in error and Schaffner to appear at his office at ten o'clock the next morning and have Rausch with them. He testified that after the fire marshal left, Schaffner said he would not go to his office next day. Plaintiff in error told him he need not be afraid to go,—that the marshal's office wanted to find out about the fires,—and he told Schaffner he would meet him and Rausch the next morning at nine o'clock at a place designated and the three would go down together. It was then about six o'clock. Plaintiff in error testified he was at that time expecting two police officers who had watched his building the night before. No one was in the building but plaintiff in error and Schaffner. Plaintiff in error was sitting at the front of the shop, looking out on the street, and Schaffner was walking back and forth in the rear. About seven o'clock Schaffner said he wished he was dead. Plaintiff in error inquired what was the matter with him, and he said, "Trouble—trouble. You remember when I was working in the summer time for you and you fired

me? I was mad because you fired me and kept another man working, and I paid $10 to my partner to burn your place down." Plaintiff in error asked Schaffner what he was talking about, and told him he had too much beer. He was drinking beer from a pail, and plaintiff in error told him he had got too much beer in his head. Schaffner said, "Every fire in your place I made, and now I don't want to make any more trouble for you and your wife; I am done," and then the shot was fired. There was no light in the building and plaintiff in error inquired what was the matter. Receiving no answer he left the building and ran over to· Pies' house, in the next block. Pies was not at home, and he then went to a saloon near by, where he found him. He told Pies to come over to his place,—that Schaffner had said he burned Pies' place and his, and that he had shot himself. At Pies' suggestion they called up the police, who came in fifteen or twenty minutes. When the officer found the revolver lying by the side of Schaffner's body and inquired of plaintiff in error if it was his he said it was; that it and a small revolver Schaffner had there that day were together in a small box. Plaintiff in error testified when the shot was fired it frightened him and he grabbed in the paper box where he had put his revolver but it was not there; that he had not seen it since putting it in the box, about ten o'clock in the forenoon. Plaintiff in error testified he and Schaffner were on good terms, and Schaffner had talked about going into business with him, but the plaintiff in error did not want a partner. He paid Schaffner the union scale of wages,—forty cents per hour.

There was no evidence tending to show plaintiff in error and Schaffner ever had any trouble or that any unfriendliness had ever existed between them, and there was nothing in the proof to indicate that plaintiff in error ever suspected Schaffner of being responsible for any of the fires which had occurred at his places of business or to show

any motive he could have had for committing the homicide, unless it be, as contended by the Attorney General, that the plaintiff in error caused the fires himself and was afraid Schaffner knew or suspected it and might give information at the fire marshal's office which would involve plaintiff in error in trouble.

Several errors are relied upon, among them that the evidence is insufficient, that the court erred in the admission of evidence, in refusing instructions asked by plaintiff in error, in permitting misconduct on the part of the State's attorney in the cross-examination of plaintiff in error, but the principal assignment of error discussed and relied upon is the action of the court in instructing the jury, on behalf of the prosecution, upon the subject of manslaughter. The third instruction given for the People is in the language of section 143 of the Criminal Code, defining manslaughter; the seventh instruction is in the language of section 144 of the Criminal Code, defining the circumstances of a homicide which would distinguish it or reduce it from murder to manslaughter; the sixteenth instruction told the jury that under the indictment they might find the defendant guilty of murder or of manslaughter, or not guilty; the thirtieth instructed the jury as to the forms of verdicts, and contained a form of verdict to be used in case the jury found plaintiff in error guilty of manslaughter. Plaintiff in error contends that there was not a scintilla of evidence upon which to base instructions upon the subject of manslaughter; that from the proof but two possible conclusions can be arrived at: either that the deceased committed suicide, or the plaintiff in error deliberately murdered him in cold blood.

If the evidence justified the conclusion that plaintiff in error committed the homicide, it must be conceded there was no proof of any circumstances to reduce the crime from murder to manslaughter. The instructions given on the subject of manslaughter stated correct propositions of

law, and the objection to them is that there was no evi-. dence upon which to base them. It is fundamental that upon the trial of an issue of fact it is erroneous to give instructions not based upon any evidence. Only such instructions should be given as are based upon legitimate evidence. If irrelevant instructions are given, correctly stating abstract principles of law calculated to mislead the jury, it will constitute reversible error. (*Humphreys* v. *Collier,* 1 Scam. 47; *Coughlin* v. *People,* 18 Ill. 266; *Fidler* v. *McKinley,* 21 id. 308; *Healy* v. *People,* 163 id. 372; *Chicago, Rock Island and Pacific Railway Co.* v. *Rathneau,* 225 id. 278.) It is the law that under an indictment for murder the defendant may be convicted of manslaughter, but this does not mean that a jury is authorized or warranted in finding a defendant guilty of manslaughter where there is no evidence tending to prove the commission of that crime, but where it is conclusively proven that if any crime was committed it was willful and deliberate murder. In *Koser* v. *People,* 224 Ill. 201, in discussing that subject, this court said: ' "Of course, the jury may,—that is, they have the power,—find a defendant guilty of manslaughter where the evidence proves a case of murder, but it is not the intention in granting this power to a jury that it will be abused and perverted by convicting of manslaughter in a case where the evidence shows a willful and malicious murder. It might be argued that because a jury has the power to acquit even where the evidence proves guilt, therefore the court ought not to instruct the jury that it was a duty to convict where the evidence proves guilt beyond a reasonable doubt. The law pronounces homicides committed with malice aforethought murder, and it is not error to embody all the elements of such crime in an instruction, and tell the jury that if those elements are proven beyond a reasonable doubt, the duty of the jury, under the law and under their oaths, is to convict of murder."

We have been referred to and have found no case in this State in which the precise question here involved was decided. In *Belt* v. *People,* 97 Ill. 461, defendant was indicted for murder. The homicide was committed in a fight in which defendant received a cut on the forehead, which a physician who examined it testified was in his opinion made with a metallic substance. Defendant claimed it was done with metallic knuckles. He was found guilty of manslaughter and judgment rendered upon the verdict sentencing him to the penitentiary. The trial court instructed the jury that under the indictment defendant could be found guilty of murder or manslaughter and what punishment was fixed by law for each of said offenses. That instruction was complained of in this court as conveying the intimation to the jury that upon the evidence in the case they could find the defendant guilty of either murder or manslaughter. The instruction was held not erroneous, but it clearly appears that there was evidence in the case upon which to properly base the instruction.

In *Davis* v. *People,* 114 Ill. 86, the defendant was indicted for murder and convicted of manslaughter. The killing occurred in the course of a heated quarrel and the evidence was conflicting as to the circumstances of the altercation and the provocation. The court instructed the jury as to the definition of manslaughter, in the language of section 143 of the Criminal Code. It was objected in this court that the instruction made no attempt to inform the jury as to what constituted involuntary manslaughter. This court said: "The case made by the evidence was either murder or voluntary manslaughter. It contained not a single element, other than the killing itself, of involuntary manslaughter, and had the court specifically defined involuntary manslaughter it would have answered no good purpose. It would have directed the attention of the jury to a principle of law not applicable to the facts of the case,

and the result would have been to confuse rather than to enlighten them on the issue they were to try."

*Barnett* v. *People,* 54 Ill. 325, was an indictment for murder. The first trial of the case resulted in a verdict finding the defendant guilty of manslaughter. The verdict was set aside and a new trial granted. On the second trial he was convicted of manslaughter and his punishment fixed at imprisonment in the penitentiary for ten years. It was conceded by the prosecution on the trial that defendant had been acquitted of murder on the first trial and could only be convicted of manslaughter on the second trial. At the instance of the prosecution the court instructed the jury that if they believed, from the evidence, the defendant was guilty of murder that would not justify them in acquitting him of manslaughter. This court said in ordinary cases such an instruction would be erroneous but it was not so when considered in the light of the record in that case, from which it appeared that on a previous trial the defendant had been convicted of manslaughter and acquitted of murder, and could not, therefore, be convicted of murder on the second trial but he might be tried and convicted of manslaughter, and that although the proof might show the crime to have been murder the jury could not find him guilty of that crime, but might, under the condition of the record, find him guilty of manslaughter.

It would seem to follow that if it would be erroneous on the first trial of a defendant charged with murder to instruct the jury that even if they believed, from the evidence, defendant was guilty of murder they might find him guilty of manslaughter, it would be equally erroneous to instruct a jury in a trial for murder, where there was not the slightest evidence to indicate that the crime might have been manslaughter but where all the evidence showed that if the defendant committed the homicide it was willful and deliberate murder, the defendant might be found guilty of manslaughter. If there had been no instructions given on

the subject of manslaughter but the jury had found defendant guilty of that crime, the judgment would not be reversed because the jury should have found the defendant guilty of murder. A reviewing court would not reverse a judgment of conviction of the lesser offense because it should have been, in the opinion of the court, for the greater offense. But that is not the situation here presented. As we have said, all the proof shows if plaintiff in error committed the homicide he was guilty of murder, and there is not one particle of evidence to justify reducing the crime to manslaughter. The instructions on the subject of manslaughter were an intimation to the jury that if they were not satisfied plaintiff in error was guilty of the only crime the evidence tended to show he could have committed they might find him guilty of a lesser offense, notwithstanding there was no evidence to sustain the finding of guilt of said lesser offense. In *State* v. *Punshon*, 124 Mo. 448, *State* v. *Hollingsworth*, 156 id. 178, *Virgil* v. *State*, 36 Miss. 317, *Dresback* v. *State*, 38 Ohio St. 365, *Coleman* v. *State*, 121 Ga. 594, and *Flynn* v. *State*, 43 Tex. Crim. 407,—all indictments for murder,—it was held erroneous to instruct the jury, where all the evidence tended to prove one offense, that the defendant might be found guilty of a lesser crime. It would have been clearly wrong for the court to have instructed the jury, at the request of plaintiff in error, that they might find him not guilty if they believed the killing was done in self-defense, and it would seem equally wrong, under the evidence in the case, to instruct the jury, at the request of the prosecution, that they might find plaintiff in error guilty of manslaughter.

We are of opinion the court erred in giving the instructions upon the subject of manslaughter, and for that error the judgment is reversed and the cause remanded.

*Reversed and remanded.*