(No. 30936.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GLENN NATHAN MARSH, Plaintiff in Error.

*Opinion filed March 24, 1949—Rehearing denied May 11, 1949.*

KNIGHT, HAYE & KEEGAN, (B. JAY KNIGHT, of counsel,) both of Rockford, for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and ROBERT R. CANFIELD, State's Attorney, of Rockford, (DALE F. CONDE, and H. EMMETT FOLGATE, of counsel,) for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Upon a jury trial in the circuit court of Winnebago County, the defendant, Glenn Nathan Marsh, was found guilty of the murder of Grant Muhrlein. His punishment was fixed at imprisonment in the penitentiary for a term of 199 years. Motions for a new trial and in arrest of judgment were overruled and judgment entered upon the verdict.

To reverse the judgment of the trial court defendant contends: (1) The trial court erred in overruling his motion for a continuance which required defendant to proceed to trial under unfair and prejudicial circumstances. (2) The trial court erred in permitting a witness for the People to testify when such witness's incompetence had been shown. (3) The trial court erred in giving and refusing certain instructions. (4) The trial court erred in refusing the defendant's instruction on manslaughter and in refusing to give the manslaughter verdict tendered by defendant. (5) The defendant was not given the fair and impartial trial guaranteed by the constitution of the United States and by the constitution of the State of Illinois.

The defendant, on November 7, 1947, the day of the homicide, was 28 years of age and resided with his wife and two children north of Rockford on U. S. Highway 51. He had lived at this location for about a year and a half prior to that date. In March, 1947, Vernon Anderson, his wife, Katherine ("Kit") Anderson and their three children

moved into the house next to the defendant. The two families became acquainted and during the summer of 1947, the defendant and Kit Anderson began seeing each other and indulging in sexual intimacies, some of which occurred in the Anderson home. Around October 1, 1947, after defendant's wife, Audrey, and Vernon Anderson both became suspicious, defendant and Mrs. Anderson talked it over and agreed they would get divorces and be married. In the latter part of October, Grant Muhrlein, father of Kit Anderson, came down from Michigan and took her and two of the children back to his home so she could think it over and decide what she was going to do. During the time she was in Michigan considerable correspondence was carried on between defendant and Mrs. Anderson, which was introduced in evidence and disclosed their infatuation and sordid affections. On November 5, 1947, Mrs. Anderson's father, her stepmother, Charlotte, the two children and Kit, drove back to Rockford, arriving at the Anderson home on North Second Street Road around 2:30 in the morning of November 6. Shortly thereafter the defendant returned from work and saw the Muhrlein car at the Anderson home. He went into his house, secured a key which Kit Anderson had given him to her back door and went over to the Anderson house. After going in and handing the key to Mrs. Anderson, he asked her if she had made up her mind what she was going to do and she answered that she had not quite made up her mind. He went back to his home and talked with his wife about the affair, about getting a divorce, division of property and who was to get the children. Later in the morning defendant again went to the Anderson home while Vernon Anderson was there and at that time. Anderson told the defendant that he knew he had been having an affair with his wife and that the defendant would have to get out. In the afternoon of that same day, Kit Anderson and her husband consulted an attorney in Rockford concerning a divorce

and after this conference they went to the home of Vernon Anderson's parents at 611 Sixth Street in Rockford, where they remained the night of the 6th. During their absence the defendant called at their home and told Charlotte Muhrlein that he would like to talk to Mr. Muhrlein and tell him he wanted to marry his daughter. He was told that Mr. Muhrlein was busy in the basement and was asked by Charlotte to go away and leave them alone. Defendant then left. On the morning of November 7, Charlotte called Audrey Marsh to the Anderson home and Grant Muhrlein told her he wanted her to know his daughter was not going to break up her home, that Kit and her husband were back together again and to tell her husband that. Shortly after noon Mrs. Marsh told defendant of this conversation, at which time he appeared to be stunned and dazed and said nothing for a few minutes. He then said, "She can't do this to me," and went to a chest of drawers in the bedroom, took some shells therefrom and drove away. He then went to his place of employment, got his pay check and later redeemed a thirty-two calibre revolver which he had left as security on November 6 with a tavern owner for a loan of $5. About 5:30 P.M. defendant appeared at the back door of the home of Vernon Anderson's parents in Rockford just about the time preparations were being made for supper. Present in the home were Vernon Anderson, his wife, mother, sister Melba Anderson, Grant Muhrlein, the deceased, and the children. The defendant knocked at the back door which was locked and secured by a chain arrangement. Gertrude Anderson, Vernon's mother, went to the door and started to open it. The first thing she saw was a black gun. She screamed and several of those present rushed to the door and attempted to push defendant out, but he rushed in, gun in hand and almost immediately started shooting. He shot and killed Vernon Anderson and Grant Muhrlein. In the meantime, Kit Anderson ran into a front bedroom, broke a window

and started screaming. She was then forced by defendant into his automobile, and after driving around for several hours, he stopped at a tourist cabin and left the car, at which time she escaped taking the gun with her. She went to a placed called "Bright Spot" northwest of Morris, Illinois, on Route 6, and there, about 11:45 P.M. on November 7, reported the matter to Sheriff Enrietta of Grundy County, turning the gun over to him. She was dressed in a house dress, had lacerations on her face and arms and was in a hysterical condition.

Defendant contends that the overruling of his motion for continuance constituted prejudicial error for the reason that about the time the cause was set down for trial there appeared, in Rockford newspapers, articles containing a history of the case which purported to state as a fact that the defendant kidnapped or abducted Kit Anderson after Grant Muhrlein and Vernon Anderson had been shot. Also, that the newspaper articles contained statements that the State's Attorney had promised the defendant's counsel that if defendant would enter a plea of guilty to the indictment the death penalty would not be requested, the defendant offering affidavits of his counsel that neither the State's Attorney, nor any of his assistants, nor any person purporting to represent the State's Attorney ever discussed the question of the entry of such a plea of guilty with defendant or his counsel. It is urged by the defendant that the grand jury which returned the indictment charging the defendant with the murder of Grant Muhrlein also returned an indictment charging him with the murder of Vernon Anderson; that immediately after the jury returned a verdict of not guilty in the Anderson case, which was in January, 1948, the State's Attorney began pressing for a trial under the indictment charging the murder of Muhrlein; that the defendant, in order to protect his rights, filed on February 2, 1948, a motion for continuance and attached thereto certain articles which had appeared in

the Rockford newspapers, which contained certain statements disapproving the action of the jurors in the Anderson case. This motion was granted and the cause continued to April 12, 1948. Later, another motion for continuance was filed, by reason of the illness of an attorney, so that the trial date was moved to May 24. On this date another motion for continuance was filed by the defendant, alleging, as we have above pointed out, the matters alleged to be prejudicial, which appeared in the Rockford publications, along with the alleged improper statements of the State's Attorney as to a guilty plea.

Defendant cites the case of *People* v. *Murawski,* 394 Ill. 236, which reversed a conviction because of the publication of facts disclosed by the State's Attorney, and it is contended that the basis of the court's reversal in that case is not nearly as prejudicial as in the instant case. We are of the opinion, however, that the instant case presents an entirely different situation with reference to the articles as published in the newspapers when compared with such publication in the *Murawski case.* In the *Murawski case* the jury was permitted to separate overnight and on the convening of the court the next day the defendant by her counsel presented a motion in which the court was asked to order and declare a mistrial. To the motion was attached the affidavit of her attorney which disclosed that in the morning issue of a local newspaper, published and circulated in that vicinity, a certain article appeared concerning the proceedings of the trial on the previous day; that the article referred to certain alleged criminal charges made against the defendant on prior occasions, and was highly prejudicial to the defendant. Under the circumstances there it can readily be seen there was no full opportunity for defendant's counsel to ascertain whether any juror had been prejudiced and to have the juror either excused for cause or peremptorily dismissed. An examination of the record in the instant case reveals that a thorough examina-

tion was afforded and made in respect to the qualifications of the jurors on their *voir dire,* as to any views they might have due to the reading of newspaper articles, and whether or not they could give the defendant a fair and impartial trial. After the jurors qualified in this respect, they were accepted by the defendant and were kept together throughout the trial.

Defendant cites the case of *Paschen* v. *United States,* 70 Fed. 2d 491, which pertained to an income-tax prosecution. There, motions were made, just before the jury was impaneled, to continue the case because of allegedly inflammatory newspaper publications appearing on the same day, and to discharge the panel. It was said that the disposition of the motions was within the discretion of the court, the record not disclosing whether any of the jurors had read or heard of the particular articles, and that the court's discretion was not abused in its denial of the motions. There was no motion in the instant case to discharge the panel and ample opportunity was given to determine whether the jurors had read or heard of the articles and would be affected thereby as fair and impartial jurors.

Defendant also cites the case of *Allen* v. *United States,* 4 Fed. 2d. 688, and while the court there condemned the practice where newspapers, hungry for sensational news, print prejudicial statements, it was held the motion there was in the discretion of the court, that the record did not disclose whether any of the jurors had read or heard of the particular articles, and that the court's discretion was not abused in its denial of the motion. It is significant, however, in the *Allen case,* that the court pointed out in its opinion, on page 697, "The jurors were fully examined in respect to their qualifications, and with reference to these murder stories." And, on page 698, "One cannot read the testimony of the 12 men given on the *voir dire* without being satisfied that they entered upon the trial of this case uninfluenced by the newspaper articles."

As we have hereinabove pointed out, in the instant case the question of newspaper influence was particularly gone into at the time the prospective jurors were interrogated and those selected made answers that they could give the defendant a fair and impartial trial. It might be further noted that the defendant accepted the jury panel and is not now in a position to complain. We find that defendant had not exhausted his peremptory challenges and was not compelled to accept as a juror any person to whom he objected. We formerly held, where an application for change of venue was made, alleging that the inhabitants of the county were prejudiced against the defendant, and where a number of clippings from newspapers were attached to the petition as exhibits, that as the defendant did not exhaust his peremptory challenges allowed him by law, and as he was not compelled to accept as a juror any person to whom he objected, he was not in a position to complain. *People* v. *Birger,* 329 Ill. 352; *People* v. *Fricker,* 320 Ill. 495.

Defendant admits the granting of a motion for continuance is ordinarily within the discretion of the trial court, but insists that the prejudice created by the publication of statements concerning the occurrence could not reasonably be expected to have been removed from the minds of the prospective jurors. Counsel, at this point, makes a statement that he does not know whether the newspapers of Rockford would ever impose enough self-restraint upon their hunger for sensationalism to allow the residents of Winnebago County to become impartial and free from prejudice. If such conditions exist wherein the inhabitants of the county, in whatever manner, have become prejudiced against the defendant in any case, provisions have been made for a change of venue, as no successful way has ever come to our attention which prevents newspapers from reporting to an ever-receptive public, news containing sordid or sensational details.

As to the proceedings in this case, defendant was arraigned and entered his plea of not guilty November 21, 1947. The cause was set for trial on January 12, 1948, and later, on January 23, defendant filed a motion for a change of venue from the Honorable William R. Dusher to the Honorable William Carroll, one of the judges of said judicial circuit, for the reason that, as he alleged, the said William R. Dusher was prejudiced against him. The motion was allowed and the cause was continued to April 12, 1948. On February 2, 1948, defendant filed a lengthy motion for continuance alleging, among other things, that as a result of newspaper articles, remarks of the court and radio announcements, the general public and the citizens of Winnebago County and the surrounding counties had become prejudiced, excited and misinformed, and that the defendant could not receive a fair and impartial trial in Winnebago County or in any of the surrounding counties covered by the newspapers; that said cause should be continued until at least the month of April, 1948, before said cause should be brought to trial in whatever county it might later be heard and tried; that if the defendant is forced to trial at any time or place in northern Illinois within 90 days from the date thereof he will not be able to receive a fair and impartial trial as guaranteed under the Federal and State constitutions; and the motion requested that the cause be continued for 90 days and during said 90 days a further motion would be filed touching the question of where said cause should be tried. On this motion the cause was continued until April 26, 1948. On April 1, 1948, another motion for continuance was filed by the defendant due to the illness of one of the attorneys. On this motion an order was made granting the continuance and setting the case for trial May 24, 1948. On May 24, 1948, when the cause was called for trial, another motion was presented for continuance, which is the motion now under consideration, stating that unless said cause should

be continued for a sufficient time to allow the prejudice and passions necessarily created by the newspaper articles to cool and to be removed from the minds of the residents of Winnebago County, defendant could not receive the fair and impartial trial guaranteed him under the Federal and State constitutions. As to just what length of time the cause should be continued is not alleged in the motion, neither is any allegation made or further motion entered which counsel in his former motion for continuance advised the court would be filed touching the question of where said cause should be tried. No motion for change of venue from the county was ever filed.

In view of what is here disclosed by the record, and what we have pointed out as to the jurors being fully examined on their *voir dire* in respect to their qualifications, and as to any views they might have due to the reading of newspaper articles, and whether or not they could give the defendant a fair and impartial trial, the jury being accepted without defendant having exhausted his peremptory challenges, we are not of the opinion the court abused its discretion in denying the motion for continuance and that in proceeding to trial the constitutional rights of the defendant were violated. We hardly see how more orderly processes could be followed in the trial of this case.

It is next contended that the court erred in allowing Lawrence Anderson, the grandson of Grant Muhrlein, who was six years old at the time of the trial, to testify as a witness for the People. It is urged the only purpose of his being called was to inflame and prejudice the jury against the defendant. His right to testify, of course, would be controlled by his understanding, and where an objection is interposed on account of a child's age, the question of permitting the child to testify is a matter resting largely in the discretion of the trial court. Before he was allowed to testify the trial court made a careful examination which was taken down out of the presence of the

jury in the judge's chambers, the defendant and counsel being present. He was then permitted to testify and was cross-examined. We have gone over the record of his testimony in chambers, as well as his testimony before the jury, and we are not of the opinion the discretion of the trial court was abused in this case. The child was an eye-witness to the killing and the only question was whether or not he was competent. As was said in the case of *People* v. *Karpovich,* 288 Ill. 268, "The requirement is not one of age but of understanding. Whether such child possessed the understanding necessary to be competent to testify may be determined, on review, from the preliminary examination and her testimony before the jury." As was said in *People* v. *Crowe,* 390 Ill. 294, quoting from *People* v. *Schladweiler,* 315 Ill. 553, "A test as to religious opinion or belief is no longer required in determining the competency of a witness. The requirement is not one of age or religious belief, but of intelligence and understanding." And it was further held that where an objection is interposed on account of a child's age, the question of permitting the child to testify is a matter resting largely in the discretion of the trial court. We think this is the rule and it is not out of harmony with the case of *People* v. *Willson,* 401 Ill. 68, cited by defendant, which case, in addition, was based on entirely different circumstances.

It is urged by defendant that instruction 29, tendered by the People, is erroneous because it refers to a crime for which the defendant was not indicted and because it refers to unlawful acts without defining them. The vice complained of in the instruction pertained to the language "was engaged in the commission of an unlawful act such as to kidnap the said Katherine Anderson." In support of the contention that it was improper to refer to the crime of kidnapping when the defendant was not on trial for such crime and was not indicted for it, the cases of *People* v. *Crane,* 302 Ill. 217, and *People* v. *Rongetti,* 331 Ill. 581,

are cited. In the *Crane case* the instruction was given in the language of the statute and the statute defined more than one crime, while the indictment contained one count charging only one of the offenses. The court there held that as the statute defined more than one crime and the instruction ended with the language "This is the offense charged in the first count of the indictment," this gave the jury to understand that if the evidence showed but a mere attempt on the part of the defendant to take indecent liberties with the complaining witness, such was sufficient to warrant his conviction under the only count in the indictment charging the act of taking indecent liberties. In the *Rongetti case*, which was reversed on other grounds, the instruction was given in the language of the statute which contained language both as to abortion and attempt to produce abortion and the instruction ended with the words, "the person procuring or causing the abortion or miscarriage shall be guilty of murder." The instruction was a statement of the law on the crime of abortion or attemped abortion. There was no evidence touching the crime of attempted abortion and the court there held, "It is the contemplation of the law that the jury shall be instructed only concerning the crime of which the defendant stands charged," citing the *Crane case*. The present instruction can be easily differentiated in that no charge in the instruction was made that by reason of the kidnapping the defendant was guilty of murder. The instruction specifically stated the deceased was killed by the defendant with malice aforethought. We might further add that the same instruction as given in *People* v. *Rongetti*, 331 Ill. 581, was given verbatim in a later trial in *People* v. *Rongetti*, 344 Ill. 278, and the court there said, "This instruction is identical with instruction No. 2 in *People* v. *Rongetti*, 331 Ill. 581. There it was held that the instruction should not have been given. The part of the instruction referred to (the crime of attempted abor-

tion) should have been stricken from the instruction before it was given. (*People* v. *Levato,* 330 Ill. 498.) While this instruction should not have been given, there is nothing in it sufficient to warrant a reversal of the judgment. Even though one or more instructions are improperly given, this court has repeatedly held that unless they are of such nature as to have resulted in injury to the defendant the fact of having given them is not ground for reversal. (*People* v. *McIntosh,* 242 Ill. 602; *People* v. *Pargone,* 327 Ill. 463; *People* v. *Talbe,* 321 Ill. 80; *People* v. *Dean,* 321 Ill. 128; *People* v. *Patrick,* 277 Ill. 210; *People* v. *Duzan,* 272 Ill. 478; *People* v. *Hubert,* 251 Ill. 514.) While this court in the former trial (331 Ill. 581) said this instruction should not have been given yet it was not condemned there as prejudicial."

The instruction in the instant case was offered for the purpose of showing that if the deceased was killed by the defendant with malice aforethought it was not necessary for the State to show it was or may have been the original intent of the defendant to kill the deceased. The instruction was not entirely accurate and should not have made reference to kidnapping, but it fully advised the jury, in any event, that the jury must believe beyond a reasonable doubt that the deceased was killed by the defendant with malice aforethought. Any further doubt as to the understanding of the jury on this instruction is clarified by instruction No. 6, given by the defendant, which provided: "The Court further instructs the jury that the fact of Grant Muhrlein's having been shot and killed by a revolver in the hands of Glenn Nathan Marsh, the defendant, is not of itself sufficient upon which to find the defendant, Glenn Nathan Marsh, guilty of murder. And, in this regard, the Court further instructs the jury that the jury should confine its verdict entirely to the narrow, precise charge laid and charged against the defendant, Glenn Nathan Marsh, to wit, murder with malice aforethought."

This, of course, instructed the jury that their determination was to be based solely on the question of murder with malice aforethought and their determination as to the guilt or innocence of the defendant must be based solely on that point.

Accuracy in the use of language in an instruction containing a correct proposition of law would, of course, be desirable, but it is not always attainable. For that reason we have announced the rule that it is sufficient if the series of instructions, considered as a whole, fully and fairly announces the law applicable to the theories of the People and of the defendant, respectively. (*People* v. *DeRosa,* 378 Ill. 557; *People* v. *Hicketts,* 324 Ill. 170.) Taken as a series the instructions defined the crime and fairly stated the law. It is not sufficient ground for reversal if one or more instructions, standing alone, are superfluous or misleading. (*People* v. *Hartwell,* 341 Ill. 155; *People* v. *Winn,* 324 Ill. 428; *People* v. *Kimler,* 324 Ill. 445; *People* v. *Storer,* 329 Ill. 536.) We are not of the opinion, taking the instructions as a series in the instant case, that the instruction complained of constituted prejudicial error.

It is next contended the court erred in refusing the defendant's instruction on manslaughter and in refusing to give the manslaughter verdict tendered by the defendant. This presents a question as to whether there is any basis in the evidence for an instruction on manslaughter. It is a well-established rule that where the evidence clearly demonstrates the killing was murder, an instruction authorizing manslaughter is erroneous. (*People* v. *DeRosa,* 378 Ill. 557; *People* v. *Moore,* 368 Ill. 455; *People* v. *Payne,* 359 Ill. 246; *People* v. *Hauke,* 335 Ill. 217; *People* v. *Brown,* 326 Ill. 640; *People* v. *Grant,* 313 Ill. 69; *People* v. *Schultz,* 267 Ill. 147.) The record in this case discloses that the defendant, after taking cartridges from his home and later securing his revolver from a tavern about 4:30 in the afternoon, appeared about 5:30 P.M. at the back

door of the Anderson home in Rockford, and, when the door was opened, shoved his way in, his hand extended with a loaded pistol, and in the midst of unarmed people began shooting, killing the deceased. Gertrude Anderson testified that she heard a rap on the door, opened it and saw defendant, Glenn Marsh, with a gun; that he started shooting right and left; that she saw the deceased's hands go up and he said, "Don't shoot;" that a second later he went down on the floor and defendant went right on shooting.

We have thoroughly examined the entire record in this case and have given careful consideration to every objection urged, as the importance of the case demands, and can find no reversible error in the record or that the defendant did not receive that fair and impartial trial to which he is entitled. The judgment, therefore, of the circuit court of Winnebago County is affirmed.

*Judgment affirmed.*